UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

UNITED STATES OF AMERICA,

v.

TROY DOUGLAS BAYLOR,

Defendant.

Action No. 3:11-CR-64

## MEMORANDUM OPINION

THIS MATTER is before the Court on the Government's Motion *in Limine* to Exclude Testimony of Brian Cutler, Ph.D. Regarding Eyewitness Identification. (Doc. No. 51.) The Government moves to exclude Defendant Troy Baylor's proposed expert testimony on eyewitness identification, arguing that Dr. Cutler's testimony not only fails under both prongs of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but also should be excluded under Rule 403 of the Federal Rules of Evidence.

After receiving the parties' written arguments, the Court conducted a *Daubert* hearing on October 31, 2011.* For the reasons stated below, the Court GRANTS the Motion.

**I.     BACKGROUND**

For purposes of resolving this Motion, the Court adopts the statement of facts set forth in the Government's Motion. The relevant facts are summarized below.

***Family Dollar Robbery.*** On November 30, 2010, an employee of a Family Dollar store in Chesterfield, Virginia was approached by an unknown man who asked for the manager. The unknown man was later identified as Defendant Troy Baylor. When the

---

* Defendant James Baylor joined the Motion at the hearing.

1

employee told Troy Baylor the manager was not there, Baylor asked for a job application. The employee told Baylor he could apply at the computer at the front of the store. Baylor asked where the wrapping paper was and then walked off.

Troy Baylor approached the employee again when the employee went outside to smoke, telling the employee, "This is what you are going to do. You are going to get me the money." A second unknown man later identified as Defendant James Baylor approached the employee, displaying a black handgun and stating, "Don't f*** around, where is the money?"

After instructing the employee to go inside, Troy Baylor led the employee to the rear of the business, but was led back to the front, where the safe was located. The employee entered the code to open the safe while James Baylor stood behind her. Troy Baylor sat at the computer located next to the safe. As the employee was attempting to open the safe James Baylor said, "Stop f***ing with me." He then told her he was going to count to three. The employee opened the safe and Troy Baylor took a tan cash box containing approximately $500.

Another employee observed what was happening and told the Defendants, "No you don't." James Baylor pointed the gun at the other employee and told her to back off. Both Defendants then ran from the store and were observed getting into a dark-colored vehicle. Video cameras inside the store captured the events of the robbery.

On January 13, 2011, the employee that retrieved the cash from the safe was shown separate photo lineups that included photos of the Defendants. The employee identified both Defendants in the lineups as the persons that robbed her on November 30, 2010.

***Rite Aid Robbery.*** On December 10, 2010, an employee of a Rite Aid store located in Richmond, Virginia was approached by an unknown man later identified as Troy Baylor.

Troy Baylor brandished a small handgun, demanding that the employee open the cash register and give him the money. The employee opened the register and Troy Baylor removed approximately $100 to $150. Baylor then jumped over the counter and exited the store. The robbery was captured on still photographs taken from store cameras.

Approximately 40 minutes prior to the robbery, the same man appeared to be shopping in the store and was asked if he needed assistance by a store clerk.

On January 13, 2011, the employee that was robbed was shown a photo lineup that included a photo of Troy Baylor. The employee identified Troy Baylor as the person that robbed her on December 10, 2010.

***Sammy's Auto Repair Robbery.*** On December 15, 2010, an employee of Sammy's Auto Repair, located in Richmond, was approached by two unknown men, later identified as the Defendants in this case. Both men ordered the employee inside the business. James Baylor ordered the employee to give him "the money," while Troy Baylor went through the employee's pockets.

Approximately $400 was taken from the employee. James Baylor ordered the employee to get onto the floor and stated, "I will count to three, and if you don't show me where the money is, I will shoot you." After Troy Baylor searched the drawers of a desk, both men fled the business.

On January 13, 2011, the employee that was robbed was shown a photo lineup that included photos of Defendants. The employee identified both Defendants in the lineups as the individuals who robbed him on December 15, 2010.

***Tommy Wilson's Auto Repair Robbery.*** On the morning of December 21, 2010, two employees of Tommy Wilson's Auto Repair were working on a vehicle in the back of the

store, when two unknown men later identified as Defendants walked in. The employees told the men, "Hey you can't come in here," to which James Baylor replied, "You can't tell me what to do," pointing a handgun at one of the employees. The employees were told to lie down on the floor, and approximately $600 was taken from one of them. The other employee resisted.

When the other employee resisted, James Baylor approached him and told him to give his money. When the employee refused, James Baylor reached into the employee's pocket and took approximately $600. An altercation ensued, resulting in James Baylor striking one of the employees on the head with the handgun. Troy Baylor, who had been looking for money in the business office, emerged from the office, grabbing the handgun from James Baylor and pointing it at the employee.

The other employee then grabbed Troy Baylor and began fighting for control of the gun. The fight carried on to the front lobby, where it was captured on videotape. During the struggle, Defendants dropped their hats and the handgun; both were later sent out for DNA analysis. DNA profiles were recovered and compared to profiles for Defendants and the employees. A DNA profile developed from a swab taken from one of the hats matched the profile of James Baylor, but insufficient information existed to draw a conclusion with respect to Troy Baylor. A DNA profile developed from blood on the gun matched that of the employee hit on the head with the weapon.

On December 30, 2010, the employees that were robbed were shown a photo lineup that included a photo of Troy Baylor. One of the employees identified Troy Baylor as one of the robbers. On January 6, 2011, a second lineup was shown to the employees that included a photo of James Baylor. One of the employees identified James Baylor as the other robber.

Two additional facts came to light at the hearing conducted on October 31, 2011. First, two of the eyewitness identifications at issue were made by African-American victims—members of the same race as the perpetrators. Second, one of the eyewitnesses who made an identification was of Asian descent.

## II. LEGAL STANDARD

As noted by the Fourth Circuit, "[A] federal district court performs an important 'gatekeeping' function in deciding whether to admit expert testimony under Federal Rule of Evidence 702." *United States v. Forrest*, 429 F.3d 73, 80 (4th Cir. 2005). When the expert testimony or evidence at issue is of a scientific or technical nature, the trial court "must ensure that [the testimony or evidence] is not only relevant, but [also] reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). The trial court has broad discretion in making this determination, and will only be reversed for a clear abuse of discretion. *United States v. Barsanti*, 943 F.2d 428, 432 (4th Cir. 1991).

In *Daubert*, the Supreme Court articulated a two-part test governing the admissibility of expert testimony under Rule 702:

> Faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

509 U.S. at 592–93.

As to the first prong of the test—"whether the expert is proposing to testify to . . . scientific knowledge"—the Court has outlined four factors that should be considered: (1) whether the theory or technique "can be (and has been tested)," (2) "whether the theory or

5

technique has been subjected to peer review and publication," (3) whether there is a known or potential error rate in the scientific technique, and (4) whether the theory or technique has achieved general acceptance in the particular scientific community. *Id.* at 593–94.

The second prong of the test, involving the assessment of whether the expert testimony or evidence "will assist the trier of fact to understand or determine a fact in issue," has been alternately described as a determination of "fit" or "relevance." The Court has explained that the expert testimony must be sufficiently linked to the facts of the case so that it will actually help the jury resolve a factual dispute. *Id.* at 591 (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

Finally, the *Daubert* Court emphasized that Rule 403 of the Federal Rules of Evidence is always available as a check to exclude expert evidence that may pass muster under the two-prong test, but nevertheless threatens to be far more prejudicial than probative. Quoting the words of Judge Weinstein verbatim, the Court specifically cautioned: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Id.* at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; it Should not Be Amended*, 138 F.R.D. 631, 632 (1991)) (internal quotation marks omitted).

Expert testimony concerning the reliability of eyewitness identification has been met with harsh scrutiny, both before *Daubert* and after. In the leading Fourth Circuit case, *United States v. Harris*, the court of appeals affirmed the exclusion of expert testimony aimed at casting doubt on the reliability of three eyewitnesses' identifications. 995 F.2d 532, 536 (4th Cir. 1993). The expert would have testified to the identifications' lack of reliability on a number of bases, including confidence and misidentification, stress, transposition of the defendant's face and features with the "actual" robber's in light of previous sightings of the defendant on the day of the robbery, and the general problem of memory distortion over time. *See id.* at 534. The court held that the "narrow circumstances" present in the few decisions allowing such testimony were not present, "[e]ven though Harris's proffer included most of the common justifications recognized as supporting the admission of such expert testimony." *Id.* at 535. The court explained that the facts of the case must support the proffer, that is, the facts must "support [the defendant's] argument that the identification was suspect." *Id.*; *see also id.* at 536 n.3 (citing *Downing*, 753 F.2d at 1242) ("[T]he offer of proof should establish the presence of factors, such as stress or differences in races, that have impaired the reliability of the eyewitness identification at issue.").

According to the *Harris* court, the "narrow circumstances held sufficient to support the introduction of expert testimony have varied but have included such problems as cross-racial identification, identification after a long delay, identification after observation under stress, and psychological phenomena [such] as the feedback factor and unconscious transference." *Id.* at 535. Factual situations which fit proffers of such expert testimony included: a prosecution supported by an identification made by a single witness under

7

stress nineteen months after the event; a case where a photospread was shown to eyewitnesses three weeks after a robbery and a lineup four months after; and fact patterns that gave rise to potential cross-racial transference and stress problems due to the racial makeup of the witnesses and defendant and the circumstances of the crime. *Id.* (citing *United States v. Sebetich*, 776 F.2d 412, 418–19 (3d Cir. 1985); *United States v. Smith*, 736 F.2d 1103, 1106 (6th Cir. 1984)). The court noted that the archetypal "problem in identifying a robber involves one identification, by one witness, under stress." *Id.*

In contrast with these situations, the *Harris* jury had an "evidentiary cornucopia" at its disposal: among other things, the court noted there was not one eyewitness identification on one occasion but instead three identifications on three different occasions, testimony about the defendant's voice, and an admission by the defendant that he was present at the site of the robbery on the day in question. *See id.* at 535–36. Further, the court said that any infirmities in the testimony of the eyewitnesses were or could have been exposed through cross-examination. *Id.* at 536.

Subsequent Fourth Circuit case law suggests that *Harris* stands for two related propositions that bear on the second prong of *Daubert*. First, *Harris* created a "common knowledge" rule—that is, "in determining whether a particular expert's testimony is sufficiently helpful to the trier of fact to warrant admission into trial, the district court should consider whether the testimony presented is simply reiterating facts already 'within the common knowledge' of the jurors." *United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995) (quoting *Harris*, 995 F.2d at 534). Second, it warned that the circumstances where an expert's testimony on eyewitness identification will be outside of the "common knowledge" of the jury are narrow: "In any case, except for narrow circumstances, expert testimony on

the reliability of witness identification 'almost by definition, can be of no assistance to a jury . . . . [J]urors using common sense and their faculties of observation can judge the credibility of an eyewitness identification.'" *United States v. Bellamy*, 26 F. App'x 250, 259 (4th Cir. 2002) (quoting *Harris*, 995 F.2d at 534–35). Fourth Circuit decisions also make clear that the rationale of *Harris* and the rules drawn from it survived *Daubert*. *See, e.g., Dorsey*, 45 F.3d at 815 (explaining the relationship between the second, "fit" prong of *Daubert* and *Harris*'s "common knowledge" rule).

### III.  DISCUSSION

The Government moves to exclude the testimony of Brian Cutler, Ph.D., a psychologist and expert in the field of eyewitness identification. Dr. Cutler's proposed testimony comprises the following factors: (1) cross-race recognition; (2) stress experienced by the eyewitness; (3) weapon focus; (4) disguises; (5) passage of time between the crime and the identification; (6) effect of prior identifications on subsequent identifications; and (7) eyewitness confidence and identification accuracy.

At the hearing, the Government conceded that Dr. Cutler's proposed testimony is based on knowledge that is "scientific" under the first prong of *Daubert*. Therefore, the Court need only determine whether testimony on each factor "will assist the trier of fact to understand or determine a fact in issue," *Daubert*, 509 U.S. at 592, and if necessary, determine whether testimony on the factor survives the balancing test of Rule 403. *See id.* at 595.

Before making those determinations, some preliminary observations concerning the Government's evidence are in order, as the Fourth Circuit in *Harris* indicated that the amount and character of the Government's evidence is an important consideration in

9

weighing whether a particular proffer of expert testimony is made in a "narrow circumstance" where it would be helpful to a jury. *See* 995 F.2d at 535–36.

Troy Baylor argues "the government's entire case relies upon the out-of-court identifications by the eyewitnesses to the crimes." (Def.'s Resp. 1–2.) This is so, according to Baylor, because "there is no DNA, fingerprint[ ] or other scientific proof that [Baylor] was the man who robbed any of the listed establishments," and because "[t]here were no inculpatory statements made by either defendant." (Def.'s Resp. 1–2.) It is true that the Government has not connected Troy Baylor to any of these crimes by placing his own DNA or fingerprints at a crime scene, on a victim, or on a gun. It is also true that the Government has not pointed to any incriminating statements made by either of the Defendants to law enforcement. But that does not mean the Government's entire case relies upon out-of-court eyewitness identifications alone. On the contrary, the Government has compiled much more evidence linking Troy Baylor to these robberies.

To begin with, it is worth pointing out that even if the Government relied only upon the eyewitness identifications made in this case, their probative value is distinguishable from a case involving, for example, a single robbery with a single eyewitness, or even a single robbery with two eyewitnesses. In this case, Troy and James Baylor have been identified as the perpetrators by an eyewitness in three separate robberies. Troy Baylor alone was identified as the robber in a fourth. From an evidentiary perspective, these identifications are important for at least two reasons. First, the identifications support the notion that the Defendants were working as a team. Second, and perhaps more important, the identifications are corroborative of one another: the fact that there are identifications

of both Defendants as the perpetrators of three robberies necessarily decreases the probability that Troy Baylor was misidentified as one of the perpetrators.

Moreover, DNA evidence supports and corroborates the eyewitness identification of James Baylor in the fourth robbery at Tommy Wilson's Auto Repair. Given Defendants' practice of working as a team, this DNA evidence not only supports and corroborates the identification of James Baylor at the fourth robbery—it supports and corroborates the identification of Troy Baylor at the fourth robbery, and of both Defendants at the first and third robberies—the other two robberies where both Defendants were identified by an eyewitness. Similarly, the fact that James Baylor made the identical threat of counting to three in two of the robberies increases the likelihood not only that James Baylor was one of the robbers, but that Troy Baylor was as well.

Finally, two more evidentiary issues bear mention. First, three of the four robberies were captured on either video or still camera. Second, the fact that all four of the robberies occurred in a small temporal and geographic space serves to increase the probability that Defendants perpetrated the robberies: the first robbery occurred on November 30, 2010, and the last occurred on December 21, 2010, and all four robberies were in the greater Richmond metropolitan region.

All of this evidence is important, because there must be some basis for Defendant's assertion that the identifications in this case are suspect, and this evidence serves to decrease the likelihood that the identifications at issue are false. *See Harris*, 995 F.2d at 535–36. With this in mind, the Court turns to the admissibility of Dr. Cutler's proposed testimony.

The Court holds that testimony on the following proposed factors is inadmissible because it is within the common knowledge of the jury: stress experienced by the eyewitness; weapon focus; disguises; passage of time between the crime and the identification; and effect of prior identifications on subsequent identifications.

In this case, all of the eyewitnesses were victims of an armed robbery—an inherently stressful experience. With regard to the factor of stress, Dr. Cutler proposed to testify that the data reveals there is an inverted U-shaped relationship between stress and identification performance: low levels of stress impair performance, moderate levels of stress tend to improve performance, and very high levels of stress—relevant here—impair performance. Everyday human experience teaches us that stress often has an adverse impact on performance, and there is reason to believe that an average juror is perfectly capable of applying that knowledge to the context of the fear-induced stress of a robbery. Expert testimony on the factor of stress is within the jury's common knowledge, and therefore would not be helpful.

Addressing "weapon focus," Dr. Cutler explained that when a weapon is visually present, the witness's focus is drawn away from the perpetrator and toward the weapon. "[T]he phenomenon of weapons focus derives both from the infrequency with which most individuals view deadly weapons and from a survival instinct that draws one's attention to potentially threatening objects." *United States v. Mathis*, 264 F.3d 321, 338 (3d Cir. 2001). Again, this factor is squarely within the jury's common knowledge. It is natural to believe that an armed robbery victim would tend to be distracted by a weapon that has the potential to inflict serious bodily harm or death, and that because of that distraction, the victim would be less likely to make an accurate identification.

On the factor of "disguise," Dr. Cutler intended to testify that a witness's ability to view the perpetrator's hairline is very important to identification accuracy. The presence of a hat, for example, would obscure distinctive individual features. This factor is within the jury's common knowledge. If a robber is wearing a hat, the witness is missing a number of critical identification cues such as hair color, hair texture, hair style, hair line, and even head size and shape. It goes without saying that any concealing of physical characteristics—and especially facial features—would serve to decrease a witness's ability to make an accurate identification.

The factor of passage of time between the crime and the identification is likewise a matter of the jury's common knowledge. As noted by the district court in *United States v. Lester*, the idea that identifications become less and less accurate as they are made further in time from the event is an entrenched judicial precept regarding common sense that finds its place in model jury instructions. 254 F. Supp. 2d 602, 611–12 (E.D. Va. 2003). Expert testimony is unnecessary to help jurors apply the relevant commonsensical proposition that memory fades over time.

Finally, expert testimony from Dr. Cutler on the effect of prior identifications on subsequent identifications would have focused on data that shows individuals who make an identification in a first test are more likely to make the same identification in a second test, regardless of whether the identification is correct or incorrect. This "commitment effect" flows from the innate human tendency toward being consistent. It is far from unexpected that a later identification may be prejudiced by a first identification. Common sense and competent cross-examination adequately address this factor. Expert testimony from Dr. Cutler on this topic would not be helpful to the jury.

Two factors remain: cross-race identification and eyewitness confidence and identification accuracy.

The factor of cross-race identification examines identifications of an individual of one race made by an individual of another race. Dr. Cutler would explain that such cross-race identifications are less likely to be accurate than same-race identifications. Put another way, the theory suggests people are more accurate at identifying people of their own race. Testimony on this factor is irrelevant with respect to two out of five identifications made in this case, as two of the identifications are "same-race" identifications. One of the remaining three identifications involves an eyewitness of Asian descent identifying an African-American perpetrator, a particular cross-race identification on which there was no specific testimony from Dr. Cutler. And though the remaining class of identifications in this case—white eyewitnesses identifying African-American perpetrators—have been the subject of cross-race identification research, Dr. Cutler's testimony did not specifically quantify the accuracy of that type of identification in comparison with same-race identifications. There is a high risk that a juror would be confused as to how to apply the general conclusion that cross-race identifications are less accurate to the specific identifications made in this case. This risk of confusion substantially outweighs the probative value of such testimony, and it will therefore be excluded.

The final factor of eyewitness confidence and identification accuracy suffers from similar defects. Dr. Cutler stated there is a "modest" correlation between eyewitness confidence and accuracy: an eyewitness with a very high degree of confidence is more likely to be correct than an eyewitness with a low degree of confidence, but only by a modest amount. Testimony that there is only a "modest" correlation between confidence

and accuracy amounts to a generalized comment on the credibility of all witnesses. This vague guidance would only serve to confuse the jury, and would risk misleading the jury as to their role as trier of fact. *See United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999) (excluding expert testimony on the eyewitness confidence and identification accuracy factor under the reasoning that such testimony would serve to confuse the jury's assessment of witness credibility). The jurors' common sense and powers of observation, along with an appropriate instruction from the Court, are all that is needed for the jurors to judge the eyewitness identifications in this case.

### IV. CONCLUSION

For the reasons stated above, the Government's Motion *in Limine* to Exclude Testimony of Brian Cutler, Ph.D. Regarding Eyewitness Identification is GRANTED.

An appropriate order shall issue.

It is SO ORDERED.

>  _____/s/_____
>  James R. Spencer
>  Chief United States District Judge

ENTERED this __28th__ day of November 2011